[No. B219089. Second Dist., Div. One. May 19, 2011.]

VINCENT ARCHER et al., Plaintiffs and Appellants, v.
UNITED RENTALS, INC., et al., Defendants and Respondents.

■■■■■■

**COUNSEL**

Kreindler & Kreindler, Gretchen M. Nelson, Gabriel S. Barenfeld, Jacob H. Mensch, Andrew L. Ciganek; Jaffe + Martin, Howard M. Jaffe and Arthur L. Martin for Plaintiffs and Appellants.

Hollins • Schechter, Kathleen Mary Kushi Carter, Christine R. Arnold; Hollins Law, Andrew S. Hollins, Jeffrey R. Gillette and Kathleen Mary Kushi Carter for Defendants and Respondents.

**OPINION**

**MALLANO, P. J.**—This is a putative class action, along with individual claims, arising from the alleged requesting and recording by United Rentals, Inc., and United Rentals Northwest, Inc. (collectively defendants), of plaintiffs' personal identification information "as a condition to accepting the credit card as payment in full or in part for goods or services," in violation of section 1747.08 of the Song-Beverly Credit Card Act of 1971 (SBCCA) (Civ. Code, § 1747 et seq.).[1]

Vincent Archer and Alistair Cochran (collectively plaintiffs) appeal from the judgment entered against defendants on their individual claims for monetary recovery under the SBCCA and the Consumers Legal Remedies Act (CLRA) (§ 1750 et seq.). On appeal, plaintiffs seek review of (1) the order granting defendants' motion for summary adjudication on the class claim for injunctive relief under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and (2) the order denying certification of a class on the SBCCA and CLRA claims.[2]

This appeal presents these significant issues: (1) Have plaintiffs established standing to pursue a UCL claim by demonstrating they "suffered injury in fact

---

[1] Undesignated statutory references are to the Civil Code.

[2] In their notice of appeal, plaintiffs purport to appeal from these two orders and from the order granting their summary judgment motion and awarding them each $250. No appeal lies

and . . . lost money or property as a result of the unfair competition" (Bus. & Prof. Code, § 17204); (2) does the privacy protection of Civil Code section 1747.08 cover the use of a business credit card; (3) does such protection extend to a cardholder who uses a personal credit card regardless of whether such use is "primarily" or "occasionally" for business purposes; and (4) is class certification foreclosed by the unreasonableness of ascertaining class membership?

We resolve the first issue in the negative. As our Supreme Court recently clarified: "It suffices to say that, in sharp contrast to the state of the law before passage of Proposition 64, a private plaintiff filing suit now must establish that he or she has personally suffered [a loss of money or property]," and plaintiffs have shown neither. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323 [120 Cal.Rptr.3d 741, 246 P.3d 877] (*Kwikset*).)[3] We answer the second issue in the negative. A plain reading of the applicable SBCCA provisions reveals that a cardholder using a business card in making the purchase is not entitled to the privacy protection of section 1747.08. As for the third issue, we find that whether the personal card is used "occasionally" or "primarily" for business purposes is a distinction without a difference. The purpose for which the personal credit card is used is of no import. The key factor is that the card was issued for personal use. Section 1747.02 unequivocally and without qualification defines a " '[c]ardholder' " as "a natural person to whom a credit card is issued for consumer credit purposes." (*Id.*, subd. (d).) The legislative history of the SBCCA confirms the Legislature intended section 1747.08 to protect the personal identification information of the natural person without regard to his or her use of the credit card.

Finally, as to the fourth issue, in light of our resolution of the third issue, we reverse the order denying class certification and remand for clarification on the final and determinative issue. In denying class certification, the trial court concluded that ascertaining the class would be unreasonable because determining the class membership would be "intensively fact-driven" in view of the court's determination that the privacy protection of section 1747.08

---

from these interim orders. Plaintiffs' challenges to these orders are proper only on appeal from the judgment. In their opening brief, plaintiffs state they abandon that portion of their appeal challenging their recovery as limited to $250 for each plaintiff.

Defendants contend plaintiffs lack standing to appeal the order denying class certification because they are not aggrieved by the trial court's rulings in that they each were awarded $250 and "they should have moved for the substitution of new class representatives who do, in fact, have standing to appeal." We disagree because plaintiffs were denied certification of their class claims. Issues regarding proper class representatives are for the trial court to address on remand. (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1351, fn. 35 [90 Cal.Rptr.3d 589].)

[3] By letter, we invited the parties to submit supplemental briefing on the applicability, if any, of *Kwikset, supra,* 51 Cal.4th 310, on the issues in this appeal. We have received their responses.

does not cover the use of business credit cards and consumer credit cards used "primarily" for business purposes. The record is unclear whether the court's unascertainability determination would remain unchanged if no need exists for sorting personal credit cards used for consumer purposes from such cards used "primarily" for business purposes.

## BACKGROUND

The facts and allegations in this appeal are taken from the pleadings and the evidence submitted in connection with the summary judgment or summary adjudication motion.[4]

The two individual plaintiffs are the putative class representatives. On May 14, 2003, Archer bought a five-gallon propane tank for his backyard barbecue using a credit card at defendants' Canoga Park store. As a condition to accepting the card as payment, defendants requested personal identification information, including his residential address, city, and ZIP code, and recorded the information on the sales invoice and in defendants' computer database. On May 18, 2003, Cochran bought a five-gallon propane tank for his backyard barbecue at defendants' West Los Angeles store. As a condition to accepting the card as payment, defendants requested his driver's license, which contained personal identification information, including his name and residence address. Defendants recorded the information on the invoice and in defendants' computer database.

On May 21, 2003, this action was filed based on alleged violations of section 1747.08 that transpired "at least as early as May 21, 1999," through "May 21, 2003." Plaintiffs, on behalf of the class and themselves as individuals, sought monetary recovery under the SBCCA (first cause of action) and the CLRA (second cause of action), and on behalf of the class, they sought injunctive relief under the UCL (third cause of action).

Defendants filed an answer denying all material allegations and asserting various affirmative defenses.

Plaintiffs filed a motion to certify a class with regard to all three causes of action. Defendants filed opposition.

---

[4] Defendants objected to these particular facts on the ground plaintiffs incorrectly treated defendants, who are different entities, as a single entity. They also objected that in their respective depositions each plaintiff testified his driver's license was requested but did not testify he was advised his transaction would be declined if he failed to provide his license. The trial court presumptively overruled these objections, and defendants, having failed to challenge the rulings on appeal, have forfeited any claim of error. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [113 Cal.Rptr.3d 327, 235 P.3d 988].)

The trial court granted in part plaintiffs' motion for class certification by certifying a class for injunctive relief on their UCL claim and deferred ruling on the SBCCA and CLRA claims.

At a hearing in June 2005, defendants argued for the first time that section 1747.08 did not protect individuals who use a business credit card issued in the individual's name. The court again deferred ruling on the certification of the class as to the SBCCA and CLRA claims and directed the parties to submit additional briefing. In such briefing, defendants argued section 1747.08 did not prohibit them from recording personal identification information of customers whose personal credit cards were used "primarily" for business purposes. Plaintiffs contended otherwise.

At a later hearing, the trial court took the matter under submission and requested additional briefing on what the effect of class certification would be if the court were to determine either business credit cards or consumer credit cards used primarily for business purposes are not covered by section 1747.08. Both parties submitted supplemental briefing on these two issues.

The court ruled that the SBCCA provides privacy protection for a consumer who uses a consumer credit card "occasionally" for a business purpose but no protection where the consumer credit card is used "primarily" for business purposes. The court further ruled that no protection exists for consumers who use business credit cards issued in their own name. The court announced its tentative ruling was not to certify a class under the SBCCA or the CLRA. The court explained that it would be an intensely fact-driven process to identify individuals who use consumer credit cards more often for business purposes and deferred its final ruling to offer "plaintiffs an opportunity to structure and suggest a method of ascertaining the class should [they] still wish to do so."[5]

Later, the trial court certified a class on the UCL claim and denied the motion to certify the class on the SBCCA and CLRA claims. The court reasoned: Prior to certification and notice, the court initially had to determine how to identify the individuals entitled to protection under section 1747.08. It would be an "intensely fact-driven" process to decide who was entitled to such protection in light of the court's finding that only certain consumers making credit card purchases were entitled to privacy protection under the SBCCA. Moreover, the costs associated with identifying the class members did not justify certification of a class under the SBCCA and the CLRA.

Plaintiffs filed a purported appeal from the order denying class certification of the SBCCA and CLRA claims. (*Archer v. United Rentals, Inc.* (Aug. 1,

---

[5] On May 4, 2006, this court denied plaintiffs' writ petition challenging the trial court's statutory interpretation as untimely and without prejudice to the challenge being raised on appeal. (*Archer v. Superior Court* (May 4, 2006, B190526).)

2008, B192190).)[6] We dismissed that appeal as having been taken from a nonappealable interim order. We explained the order denying class certification on the SBCCA and CLRA claims was not appealable as the equivalent of a final judgment under the death knell doctrine because the UCL claim remained. Our Supreme Court denied plaintiffs' petition for review (*Archer v. United Rentals, Inc* (Oct. 28, 2008, S166676)).

Defendants filed a motion for summary adjudication on the UCL claim. Plaintiffs filed a motion for summary judgment or summary adjudication as to the individual claims under the SBCCA and the CLRA.

The trial court granted defendants' motion for summary adjudication as to the UCL claim for injunctive relief on behalf of the class. The court determined that although defendants benefited from their recording of personal identification information, plaintiffs lacked standing to proceed because they did not lose money or property. On the same date, the court also granted plaintiffs' motion for summary judgment and awarded each plaintiff the amount of $250 on their individual claims under the SBCCA and the CLRA. Plaintiffs appeal from the judgment.

## DISCUSSION

### 1. *No Standing to Prosecute UCL Class Claim*

█ Plaintiffs first must establish standing in order to prosecute their UCL class claim for injunctive relief by demonstrating they have "suffered injury in fact and [have] lost money or property," and they have failed to do so. (Bus. & Prof. Code, §§ 17204, 17535.) In *Kwikset*, our Supreme Court was faced with defining these terms. The court concluded that "proof of injury in fact will in many instances overlap with proof of the next element of standing, to have 'lost money or property.' ([Bus. & Prof. Code,] §§ 17204, 17535.)" (*Kwikset, supra*, 51 Cal.4th at p. 323.) The court explained: "Neither the text of Proposition 64 nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property,' nor can or need we supply an exhaustive list of the ways in which unfair competition may cause economic harm. It suffices to say that, in sharp contrast to the state of the law before passage of Proposition 64, *a private plaintiff filing suit now must establish that he or she has personally suffered such harm.*" (*Kwikset*, at p. 323, italics added.)

---

[6] On July 3, 2006, plaintiffs filed a companion writ petition as an alternative. (*Archer v. Superior Court* (July 20, 2006, B192023).) The petition was denied on July 20, 2006, and their petition for review was denied on September 27, 2006 (*Archer v. Superior Court* (Sept. 27, 2006, S145460)).

■ The court further concluded that "we may infer from the text of Proposition 64 that the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact; if more were needed, the drafters could and would have so specified. [Citation.]" (*Kwikset, supra,* 51 Cal.4th at p. 324.) The court observed, "concerning the order in which the elements of standing are best considered," "[i]f a party has alleged or proven a personal, individualized loss of money or property in any nontrivial amount, he or she has also alleged or proven injury in fact. Because the lost money or property requirement is more difficult to satisfy than that of injury in fact, for courts to first consider whether lost money or property has been sufficiently alleged or proven will often make sense. If it has not been, standing is absent and the inquiry is complete. If it has been, the same allegations or proof that suffice to establish economic injury will generally show injury in fact as well [citation], and thus it will again often be the case that no further inquiry is needed." (*Id.* at p. 325.)

In *Kwikset*, false advertising was the underlying unfair business practice, namely, labels representing that locksets were " 'Made in U.S.A.' or similar labels on more than two dozen products that either contained screws or pins made in Taiwan or involved latch subassembly performed in Mexico." (*Kwikset, supra,* 51 Cal.4th at pp. 317–318.) The court concluded the plaintiffs showed the requisite standing (on demurrer) because they alleged that they saw and relied on the labels in which the false representations were made, and they would not have bought the locksets except for the representations on the labels. (*Kwikset,* at pp. 327–328.)

■ In this case, plaintiffs essentially claim the unfair business practice is the unlawful collection and recordation of their personal identification information, an invasion of their right of privacy, which, they maintain, constitutes an "injury in fact." (See *Kwikset, supra,* 51 Cal.4th at pp. 322–323.) Yet plaintiffs have failed to demonstrate how such privacy violation translates into a loss of money or property. Thus, the absence of "lost money or property" is fatal to plaintiffs' UCL class claim for injunctive relief.

## 2. *SBCCA Class Claim*

As pleaded in the complaint, the CLRA claim is simply an alternative legal theory based on the same alleged SBCCA violations. The parties do not contend otherwise, nor do they address the order denying certification of the class under the CLRA on any other basis. We therefore address the propriety of such ruling on the CLRA class claim only in the context of our discussion of the SBCCA class claim.

Plaintiffs contend the trial court erred in finding that the proscription of section 1747.08 against the requesting and recording of personal identification information does not include business credit cards nor personal credit cards used "primarily" for business purposes.

■ We hold that section 1747.08 does not apply to credit cards issued for business purposes. ■ But we further hold that the privacy protection of section 1747.08 applies to "a natural person to whom a credit card is *issued for consumer credit purposes*" (§ 1747.02, subd. (d), italics added) without regard to the actual purpose for which the card is used, namely, business or otherwise.

### a. *Applicable Legal Principles*

■ "We independently review questions of statutory construction. [Citation.] In doing so, we look first to the words of a statute, 'because they generally provide the most reliable indicator of legislative intent.' [Citation.] We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation]. 'In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " ' [Citation.] We are also mindful of 'the general rule that civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose.' [Citations.] 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.] 'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.' [Citation.]" (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529–530 [120 Cal.Rptr.3d 531, 246 P.3d 612].)[7]

■ " '[C]ourts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citations.] Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. [Citations.] 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

---

[7] We invited the parties to address the impact, if any, of *Pineda v. Williams-Sonoma Stores, Inc., supra,* 51 Cal.4th 524, on the issues of this appeal. We have received their responses.

### b. *SBCCA Pertinent Provisions*

The SBCCA provides that, other than enumerated exceptions,[8] "no person, firm, partnership, association, or corporation that accepts credit cards for the transaction of business shall . . . [¶] . . . [¶] . . . [r]equest, or require as a condition to accepting the credit card as payment in full or in part for goods or services, the cardholder to provide personal identification information, which the person, firm, partnership, association, or corporation accepting the credit card writes, causes to be written, or otherwise records upon the credit card transaction form or otherwise." (§ 1747.08, subd. (a)(2).) "Any person who violates this section shall be subject to a civil penalty not to exceed two hundred fifty dollars ($250) for the first violation and one thousand dollars ($1,000) for each subsequent violation, to be assessed and collected in a civil action brought by the person paying with a credit card, by the Attorney General, or by the district attorney or city attorney . . . ." (§ 1747.08, subd. (e).)

The SBCCA defines these terms: " '[P]ersonal identification information . . .' means information concerning the cardholder, other than information set forth on the credit card, and including, but not limited to, the cardholder's address and telephone number."[9] (§ 1747.08, subd. (b).) " 'Credit card' means any card, plate, coupon book, or other single credit device existing for the purpose of being used from time to time upon presentation to obtain money, property, labor, or services on credit."[10] (§ 1747.02, subd. (a).) " 'Cardholder' means a natural person to whom a

---

[8] These exceptions are: "(1) If the credit card is being used as a deposit to secure payment in the event of default, loss, damage, or other similar occurrence"; "(2) Cash advance transactions"; "(3) If the person, firm, partnership, association, or corporation accepting the credit card is contractually obligated to provide personal identification information in order to complete the credit card transaction or is obligated to collect and record the personal identification information by federal law or regulation"; and "(4) If personal identification information is required for a special purpose incidental but related to the individual credit card transaction, including, but not limited to, information relating to shipping, delivery, servicing, or installation of the purchased merchandise, or for special orders." (§ 1747.08, subd. (c)(1)–(4).)

[9] However, "[i]f the cardholder pays for the transaction with a credit card number and does not make the credit card available upon request to verify the number, the cardholder's driver's license number or identification card number may be recorded on the credit card transaction form or otherwise." (§ 1747.08, subd. (d).)

[10] The following are excluded from this definition: "(1) Any single credit device used to obtain telephone property, labor, or services in any transaction under public utility tariffs"; "(2) Any device that may be used to obtain credit pursuant to an electronic fund transfer, but only if the credit is obtained under an agreement between a consumer and a financial institution to extend credit when the consumer's asset account is overdrawn or to maintain a specified minimum balance in the consumer's asset account"; and "(3) Any key or card key used at an automated dispensing outlet to obtain or purchase petroleum products . . . that will be *used primarily for business rather than personal or family purposes*." (§ 1747.02, subd. (a)(1)–(3), italics added.)

credit card is *issued for consumer credit purposes*, or a natural person who has agreed with the card issuer to pay consumer credit obligations arising from the issuance of a credit card to another natural person. *For purposes of Sections 1747.05, 1747.10, and 1747.20*,[11] the term includes any person to whom a credit card is *issued for any purpose, including business*, commercial, or agricultural use, or a person who has agreed with the card issuer to pay obligations arising from the issuance of that credit card to another person." (§ 1747.02, subd. (d), italics added.)

### c. Legislative Intent Regarding Pertinent Provisions of SBCCA

In considering whether section 1747.08 applies to business cards or to personal cards used for business purposes, whether "occasionally" or "primarily," we reviewed the legislative history of the SBCCA, and in particular of sections 1747.02 and 1747.08. (See, e.g., *In re J. W.* (2002) 29 Cal.4th 200, 211 [126 Cal.Rptr.2d 897, 57 P.3d 363] ["To determine the purpose of legislation, a court may consult contemporary legislative committee analyses of that legislation, which are subject to judicial notice."]; *California Teachers Assn. v. San Diego Community College Dist., supra*, 28 Cal.3d at p. 700 ["A legislator's statement is entitled to consideration . . . when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion."].)[12]

■ Section 1747.08, subdivision (a)(2), prohibits, "as a condition to accepting the credit card as payment in full or in part for goods or services,"

---

[11] Section 1747.05 concerns enumerated limitations on issuance of a credit card. Section 1747.10 addresses the limitations on liability of the cardholder for unauthorized credit card use. Section 1747.20 concerns the issuance of multiple credit cards for use of an organization's employees, the organization's authority to agree "to liability for unauthorized use without regard to Section 1747.10," and restricting imposition of liability "only in accordance with Section 1747.10."

[12] At trial, plaintiffs submitted the legislative history of sections 1747.02, subdivision (d), and 1747.08, which was authenticated through their counsel's declaration. We granted plaintiffs' request to take judicial notice of these matters. We also take judicial notice of the legislative history of the SBCCA as originally enacted in 1971, which history we also have reviewed. (Stats. 1971, ch. 1019, § 4, pp. 1958–1963.) Nonetheless, where, as here, the original intent behind the pertinent provisions of the SBCCA is clear, the legislative history is merely useful as additional support, and it would be inappropriate for this court to infer legislative intent based on such history. (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 697 [37 Cal.Rptr.3d 149, 124 P.3d 719] ["Although the plain language of the statutes dictates the result here [citation], legislative history provides additional authority."]; see also *Martin v. Szeto* (2004) 32 Cal.4th 445, 451–452 & fn. 9 [9 Cal.Rptr.3d 687, 84 P.3d 374] [although judicial notice of legislative history granted, no inference of legislative intent arises where original intent behind statutory provision clear]; *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1172, fn. 5 [72 Cal.Rptr.3d 624, 177 P.3d 232] [grant of judicial notice of "legislative history documents" merely means "we will at least *consider* them, even if, as here, we ultimately find some to be of little or no help in ascertaining legislative intent"].)

requesting or requiring "the cardholder to provide personal identification information, which the [one] accepting the credit card writes, causes to be written, or otherwise records upon the credit card transaction form or otherwise."[13] "For purposes of this section 'personal identification information' means information concerning the cardholder, other than information set forth on the credit card, and including, but not limited to, the cardholder's address and telephone number." (§ 1747.08, subd. (b).)

As enacted in 1971, the SBCCA did not address the personal identification information of the cardholders. It essentially set forth guidelines to resolve credit card billing errors; prohibited dissemination of false information about a cardholder, which conformed state law to federal law, and dissemination of unfavorable credit information under specified circumstances; prohibited the refusal to issue a credit card solely because of race, religion, color, national origin, ancestry, or sex; eliminated the holder-in-due-course defense on major credit card purchases; and made it a misdemeanor to publish the number or code of credit cards. (See Legis. Counsel's Dig., Sen. Bill No. 97, 3 Stats. 1971 (1971 Reg. Sess.) Summary Dig., p. 146; Sen. Song, Floor Statement, Sen. Bill No. 97 (1971 Reg. Sess.) Jan. 13, 1971; Assem. Com. on Finance and Insurance, Analysis of Sen. Bill No. 97 (1971 Reg. Sess.) as amended July 30, 1971, p. 1.)

The SBCCA was amended in 1982. (Stats. 1982, ch. 545, §§ 1, 4, 6, 8–10, pp. 2480, 2482–2483.) The Legislative Counsel's Digest stated this amendment would "revise the definition[] of the term[] 'cardholder,' " among others in the SBCCA; "as specified," and that it "would, in addition, make a statement of legislative intent with respect to the construction of the provisions of the" SBCCA.[14] (Legis. Counsel's Dig., Sen. Bill No. 1919, 6 Stats. 1982 (1981–1982 Reg. Sess.) Summary Dig., p. 182.)

---

[13] In this same context, requesting or requiring "the cardholder to write any personal identification information upon the credit card transaction form or otherwise" is prohibited as well. (§ 1747.08, subd. (a)(1).) Also prohibited is "[u]tiliz[ing], in any credit card transaction, a credit card form which contains preprinted spaces specifically designated for filling in any personal identification information of the cardholder." (§ 1747.08, subd. (a)(3).)

In contrast, section 1725 prohibits both requiring "the person paying with a negotiable instrument to provide a credit card [(within the meaning of § 1747.02)] as a condition of acceptance of [a] negotiable instrument, or [to] record the number of the credit card" and "[r]ecord[ing] a credit card number in connection with any part of the transaction." (§ 1725, subds. (a)(1), (3) & (b)(2).) Section 1725 does not prohibit any person from "[r]equiring, verifying, and recording the purchaser's name, address, and telephone number." (§ 1725, subd. (c)(5).) We find misplaced plaintiffs' reliance on section 1725, which is not part of the SBCCA and concerns what a person in "accepting a negotiable instrument as payment in full or in part for goods or services sold or leased at retain" shall or shall not do. (§ 1725, subd. (a).)

[14] " 'The Legislative Counsel's Digest is printed as a preface to every bill considered by the Legislature.' [Citation.] The Legislative Counsel's summaries 'are prepared to assist the Legislature in its consideration of pending legislation.' [Citation.] Although the Legislative

Originally, the SBCCA defined " 'Cardholder' [as] any person to whom a credit card is issued or any person who has agreed with the card issuer to pay obligations arising from the issuance of a credit card to another person." (Stats. 1971, ch. 1019, § 4, pp. 1958–1959.) This definition was revised to provide in pertinent part: " 'Cardholder' means a natural person to whom a credit card *is issued for consumer credit purposes . . . . For purposes of Sections 1747.05, 1747.10, and 1747.20,* the term includes any person to whom a credit card is *issued for any purpose, including business . . . .*" (§ 1747.02, subd. (d), italics added, as amended by Stats. 1982, ch. 545, § 2, p. 2480.)

The 1982 amendment added section 1747.01, which provides: "It is the intent of the Legislature that the provisions of this title as to which there are *similar provisions* in the federal Truth in Lending Act, as amended (15 U.S.C. 1601, et seq.), essentially conform, and be interpreted by anyone construing the provisions of this title to so conform, to the Truth in Lending Act and any rule, regulation, or interpretation promulgated thereunder by the Board of Governors of the Federal Reserve System, and any interpretation issued by an official or employee of the Federal Reserve System duly authorized to issue such interpretation." (§ 1747.01, italics added, added by Stats. 1982, ch. 545, § 1, p. 2480.)

> d. *Purposes and Interpretation of the Truth in Lending Act and Regulation Z*[15]

The purpose of the Truth in Lending Act (TILA; 15 U.S.C. § 1601 et seq.) is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." (15 U.S.C.A. § 1601(a).) "By erecting a barrier between the seller and the prospective purchaser in the form of hard facts, Congress expressly sought 'to . . . avoid the uninformed use of credit.' [Citation.]" (*Mourning v. Family Publications Service, Inc.* (1973) 411 U.S. 356, 377 [36 L.Ed.2d 318, 93 S.Ct. 1652].)

"In March 1980, Congress adopted the Truth in Lending Simplification and Reform Act (Title VI of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. 96-221). Although the act has been

---

Counsel's summaries are not binding [citation], they are entitled to great weight. [Citation.] 'It is reasonable to presume that the Legislature amended those sections with the intent and meaning expressed in the Legislative Counsel's digest.' [Citation.]" (*Jones v. Lodge at Torrey Pines Partnership, supra,* 42 Cal.4th at pp. 1169–1170.)

[15] Part 226 of title 12 of the Code of Federal Regulations is known as "Regulation Z." (See 12 C.F.R. § 226.1(a) (2011).)

revised several times since its adoption in 1968, the Simplification Act marked the first concerted effort by Congress . . . to reduce federal Truth in Lending requirements. Among its major provisions are (1) a significant reduction in consumer credit disclosures, particularly in closed-end transactions, (2) reimbursement requirements for certain cost understatements, (3) a decrease in civil liability for violations, and (4) revisions in the act's application to real estate transactions." (Fed. Reserve System, 12 C.F.R. § 226 supp. information, 46 Fed.Reg. 20848 (Apr. 7, 1981).) This new act became effective on April 1, 1982. (*Ibid.*)

"Because of their complexity and variety, however, credit transactions defy exhaustive regulation by a single statute. Congress therefore delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. [Citations.] The Board executed its responsibility by promulgating Regulation Z, 12 CFR Part 226 (1979), which at least partly fills the statutory gaps." (*Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, 559–560 [63 L.Ed.2d 22, 100 S.Ct. 790].)

On April 1, 1981, the Board of Governors of the Federal Reserve System adopted "a complete revision of its Regulation Z (Truth in Lending)," which implemented the Truth in Lending Simplification and Reform Act (Pub.L. No. 96-221 (Mar. 31, 1980) 94 Stat. 168). (Fed. Reserve System, 12 C.F.R. § 226 supp. information, 46 Fed.Reg. 20848 (Apr. 7, 1981).)

■ "At the threshold, . . . interpretation of TILA and Regulation Z demands an examination of their express language; absent a clear expression, it becomes necessary to consider the implicit character of the statutory scheme." (*Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at p. 560.) "It is a commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation. Because legislators cannot foresee all eventualities, judges must decide unanticipated cases by extrapolating from related statutes or administrative provisions. But legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme." (*Id.* at p. 565.)

e. *Relevant Definition of "Cardholder" Under the TILA and Regulation Z*

■ The TILA defines " 'cardholder' " in pertinent part to mean "any person to whom a credit card is issued." (15 U.S.C.A. § 1602(n).) But Regulation Z refines this definition to mean "a *natural* person to whom a credit card is issued for *consumer credit purposes* . . . . For purposes of

§ 226.12(a) and (b),[16] the term includes any person to whom a credit card is issued for any purpose, including business, commercial or agricultural use, or a person who has agreed with the card issuer to pay obligations arising from the issuance of such a credit card to another person." (12 C.F.R. § 226.2(a)(8) (2011), italics added.)

  f. *Business Cards Not Included for Privacy Protection Under the SBCCA*

  ■ A plain reading of section 1747.02, subdivision (d), as a whole and in context, leads us to conclude that a credit card issued for business purposes, namely, a business credit card, is distinct from a credit card issued for consumer purposes, namely, a personal credit card. The definition of

---

[16] Part 226.12(a) of title 12 of the Code of Federal Regulations (2011), which sets forth special credit card provisions, reads: "(a) *Issuance of credit cards.* Regardless of the purpose for which a credit card is to be used, including business, commercial, or agricultural use, no credit card shall be issued to any person except—[¶] (1) In response to an oral or written request or application for the card; or [¶] (2) As a renewal of, or substitute for, an accepted credit card."

Part 226.12(b) of title 12 of the Code of Federal Regulations (2011) reads: "(b) *Liability of cardholder for unauthorized use.* (1)(i) *Definition of unauthorized use.* For purposes of this section, the term 'unauthorized use' means the use of a credit card by a person, other than the cardholder, who does not have actual, implied, or apparent authority for such use, and from which the cardholder receives no benefit. [¶] (ii) *Limitation on amount.* The liability of a cardholder for unauthorized use of a credit card shall not exceed the lesser of $50 or the amount of money, property, labor, or services obtained by the unauthorized use before notification to the card issuer under paragraph (b)(3) of this section. [¶] (2) *Conditions of liability.* A cardholder shall be liable for unauthorized use of a credit card only if: [¶] (i) The credit card is an accepted credit card; [¶] (ii) The card issuer has provided adequate notice of the cardholder's maximum potential liability and of means by which the card issuer may be notified of loss or theft of the card. The notice shall state that the cardholder's liability shall not exceed $50 (or any lesser amount) and that the cardholder may give oral or written notification, and shall describe a means of notification (for example, a telephone number, an address, or both); and [¶] (iii) The card issuer has provided a means to identify the cardholder on the account or the authorized user of the card. [¶] (3) *Notification to card issuer.* Notification to a card issuer is given when steps have been taken as may be reasonably required in the ordinary course of business to provide the card issuer with the pertinent information about the loss, theft, or possible unauthorized use of a credit card, regardless of whether any particular officer, employee, or agent of the card issuer does, in fact, receive the information. Notification may be given, at the option of the person giving it, in person, by telephone, or in writing. Notification in writing is considered given at the time of receipt or, whether or not received, at the expiration of the time ordinarily required for transmission, whichever is earlier. [¶] (4) *Effect of other applicable law or agreement.* If state law or an agreement between a cardholder and the card issuer imposes lesser liability than that provided in this paragraph, the lesser liability shall govern. [¶] (5) *Business use of credit cards.* If 10 or more credit cards are issued by one card issuer for use by the employees of an organization, this section does not prohibit the card issuer and the organization from agreeing to liability for unauthorized use without regard to this section. However, liability for unauthorized use may be imposed on an employee of the organization, by either the card issuer or the organization, only in accordance with this section." (Fns. omitted.)

"cardholder" in the SBCCA is restricted to "*a natural person* to whom a credit card is *issued for consumer credit purposes*" in all instances except for three provisions—sections 1747.05, 1747.10, and 1747.20—in which case the definition is expanded to include "any person," not just "a natural person," and where the "credit card is *issued for any purpose, including business.*" (§ 1747.02, subd. (d), italics added.)

■■■ Giving full effect to this composite definition of "cardholder," and especially because section 1747.08 is not listed as one of the exceptions to which the expanded definition applies, we conclude that credit cards issued for business purposes are excluded from the privacy protection afforded under section 1747.08. (See, e.g., *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 [81 Cal.Rptr.2d 471, 969 P.2d 564] ["Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning."].)

g. *Personal Cards Used for Business Under SBCCA Privacy Protection*

The trial court concluded the privacy protection of section 1747.08 applies to a transaction where a personal credit card is used "occasionally" for business purposes but not where it is used "primarily" for business purposes. We disagree. The purpose for which the card is used for a particular transaction is inconsequential in light of the clear and unambiguous phrase "a credit card . . . *issued* for consumer . . . purposes" in subdivision (d) of section 1747.02. (Italics added.) The Legislature could have made, but did not make, "use" a prerequisite by employing language such as: "a credit card used for consumer purposes"; "a credit card issued and used for consumer purposes"; or "a credit card issued for consumer purposes and used occasionally for business purposes." Subdivision (d) of section 1747.02 also speaks of "a credit card . . . issued for any purpose, including business" in reference to sections 1747.05, 1747.10, and 1747.20. We decline to graft onto the definition of "cardholder" any requirement that the card be *used* for a particular purpose or purposes.

We therefore conclude that the privacy protection of section 1747.08 applies to "a natural person to whom a credit card is *issued* for consumer credit purposes" without regard to a transaction-by-transaction inquiry into, and a determination of, the actual purpose for which the card is used. (§ 1747.02, subd. (d), italics added.)

Our conclusion is supported by the expression of legislative intent in the SBCCA, as amended in 1982, that the SBCCA "essentially conform" to "similar provisions" in the TILA. In the 1982 amendment, the Legislature repealed six provisions of the SBCCA and enacted four new provisions in their stead. None of these provisions pertained to personal identification information. (See Legis. Counsel's Dig., Sen. Bill No. 1919, 6 Stats. 1982 (1981–1982 Reg. Sess.) Summary Dig., p. 182.) The new provisions are comparable to those in the TILA or Regulation Z which pertain to a cardholder's liability for unauthorized credit card use if certain specific conditions are met; the timeframe in which the card issuer must correct any billing error it made; and the defenses to which the card issuer is subject under certain specified conditions. (Sen. Com. on Judiciary, Background Information on Sen. Bill No. 1919 (1981–1982 Reg. Sess.) attachment 1, summary analysis of proposed Song-Beverly amends., Jan. 14, 1982, pp. 1–3 [state archives].)

We point out the TILA does not contain a provision "similar" to the privacy protection provision of section 1747.08. The TILA does not in fact address the issue whether a cardholder is entitled to protection of his or her personal identification information. We therefore find inapplicable the cases cited by defendants as interpreting coverage under the TILA for consumer credit cards used "occasionally" but not "primarily" for business purposes. (See, e.g., *American Express Co. v. Koerner* (1981) 452 U.S. 233, 241–244 [68 L.Ed.2d 803, 101 S.Ct. 2281]; *Zeltzer v. Carte Blanche Corp.* (W.D.Pa. 1977) 76 F.R.D. 199, 203; *Berkman v. Sinclair Oil Corp.* (M.D.Ill. 1973) 59 F.R.D. 602, 609.)

According to the Senate Committee on the Judiciary, the proposed 1982 amendment to the SBCCA "would amend the [SBCCA] to conform it with the new federal regulation Z by changing various definitions, time limits, disclosure requirements, and the penalty to the card holder for the unauthorized use of his credit card. [¶] The purpose of the bill is to bring California law into conformity with federal law and regulations regulating credit card issuers nationwide." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1919 (1981–1982 Reg. Sess.) as introduced Mar. 16, 1982, p. 2.) And the bill would "amend the provisions in the [SBCCA] so that they are *the same as* those in the [TILA]." (*Ibid.*, italics added.)

On the subject of definitions, the committee noted "[a] cardholder, for purposes of the protections in the [SBCCA], is presently defined as being any person to whom a credit card is issued. [¶] This bill would limit the

protections of the Act to any 'natural person.' The *purpose* of this change is *to exclude cards held by businesses* from the provisions of the [SBCCA] other than those dealing with unauthorized use." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1919, *supra*, as introduced Mar. 16, 1982, p. 6, italics added; see also Sen. Democratic Caucus, 3d reading analysis of Sen. Bill No. 1919 (1981–1982 Reg. Sess.) May 20, 1982, p. 3; Sen. Bill No. 1919, Sen. Final Hist. (1981–1982 Reg. Sess.) p. 1116.) The Senate Committee on the Judiciary noted, "The revised 'cardholder' definition conforms to §226.2(a)(8) of new Regulation Z, and the specific addition of the words 'natural' to modify 'persons' is intended to *exclude business cards* from coverage under parts of [the SBCCA]." (Sen. Com. on Judiciary, summary analysis of proposed Song-Beverly amends., Sen. Bill No. 1919 (1981–1982 Reg. Sess.) Jan. 14, 1982, p. 1, italics added.)

As one appellate court explained: "When the bank issues a business credit card, it does so on the basis of the business's credit rating. A cardholder may not have it both ways, apply for and receive a business credit card, but use it for personal purposes and expect to receive consumer protection." (*Martin v. Wells Fargo Bank* (2001) 91 Cal.App.4th 489, 499 [110 Cal.Rptr.2d 653].)

In issuing a consumer credit card, the bank relies on the consumer's credit rating *and* personal identification information. Section 1747.08 prohibits the requesting and recording of such information as a condition for approval of a transaction involving a "credit card . . . *issued* for consumer credit purposes." (§ 1747.02, subd. (d), italics added.) Nowhere in the SBCCA or the legislative history of sections 1747.02 and 1747.08 is there any indication that the consumer must use or cannot use his or her personal credit card "primarily," or only, for a particular purpose or purposes to fall within the purview of section 1747.08.

Former section 1747.8 was originally added in 1990 (Stats. 1990, ch. 999, § 1, pp. 4191–4193) and renumbered as section 1747.08 in 2004 (Stats. 2004, ch. 183, § 29, p. 981). The background summary for Assembly Bill No. 2920 (1989–1990 Reg. Sess.), which added former section 1747.8, reads: "AB 2920 seeks to protect the personal privacy of consumers who use credit cards to purchase goods or services by prohibiting retailers from requiring consumers to provide addresses, telephone numbers and other personal information that is unnecessary to complete the transaction and that the retailer does not need." (Assem. Com. on Finance and Insurance, background summary for Assem. Bill No. 2920 (1989–1990 Reg. Sess.) p. 3.) Section 1747.08 therefore serves to protect the privacy of the natural cardholder and his or her personal identification information. It would be contrary to the Legislature's intent in adding section 1747.08 to the SBCCA if this court were to carve away such protection where a personal card is used "primarily" for business

purposes. This would lead to the disclosure of the natural person's personal identification information although he or she used a personal card. Such a consequence would be adverse and abhorrent to the Legislature's purpose. We therefore reject such an interpretation of section 1747.08.

■ In view of the above, we conclude that no inquiry into and determination of the reason for using a consumer credit card, for example, personal or business, is a prerequisite to the applicability of section 1747.08's privacy protection. This conclusion comports with and furthers the Legislature's purpose to protect fully the personal privacy of an individual in his or her personal identification information during a transaction involving the credit card issued for consumer purposes. (See *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1020 [22 Cal.Rptr.3d 876, 103 P.3d 276] [consequences of interpretation "consistent with the Legislature's purposes"].)

And we note the Legislature did not incorporate into the SBCCA a definition of "consumer," which the TILA and Regulation Z adopted, or the term "consumer credit," which Regulation Z adopted. The TILA provides: "The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are *primarily for personal, family, or household purposes*." (15 U.S.C.A. § 1602(i), italics added.) Regulation Z states: "*Consumer credit* means credit offered or extended to a consumer primarily for personal, family, or household purposes." (12 C.F.R. § 226.2(a)(12) (2011).)[17]

Had the Legislature intended that the linchpin of privacy protection of section 1747.08 be the "use" or a use be "primarily" for one purpose or another, the Legislature clearly knew how to do this. (See, e.g., § 1747.02, subd. (a)(3) [defining "credit card" to exclude "[a]ny key or card key used at an automated dispensing outlet to obtain or purchase petroleum products . . . that will be *used primarily for business rather than personal or family purposes*" (italics added)].)

We note that evisceration of the privacy protection afforded by section 1747.08 might transpire if we concluded otherwise. In many, if not all, consumer credit card face-to-face transactions, either the retailer would have

---

[17] Regulation Z defines "consumer" as "a cardholder or natural person to whom consumer credit is offered or extended." (12 C.F.R. § 226.2(a)(11) (2011).) This definition is substantially identical to the definition of "cardholder," other than for the purposes of section 226.12(a) and (b), in Regulation Z. (12 C.F.R. § 226(a)(8) (2011).)

to inquire of the consumer, or the consumer would have to advise the retailer, whether the transaction was for personal or business use and if for business use, whether the card was used "primarily" or only "occasionally" for business use. If the consumer stated either the transaction was for personal use or for business use but the card was used only "occasionally" for business purposes, must the retailer take this information at face value, or may the retailer challenge the consumer's credibility and request and record his or her personal identification information with impunity? Our conclusion obviates such an untenable situation.

### 3. Remand for Clarification on Ascertainability Issue Warranted

" ' "Ascertainability . . . goes to the heart of the question of class certification," ' and ' "requires a class definition that is 'precise, objective and presently ascertainable.' . . ." ' [Citation.] The purpose of the ascertainability requirement is to ensure it is possible ' "to give adequate notice to class members" ' and ' "to determine after the litigation has concluded who is barred from relitigating." ' [Citation.] The ascertainability requirement is satisfied if 'the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation . . . .' [Citation.]" (*Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 919 [117 Cal.Rptr.3d 66].) Class members are "ascertainable" where they may be identified readily without unreasonable expense or time by reference to official or business records. (*Ibid.*) "The party seeking certification has the burden to establish the existence of . . . an ascertainable class . . . ." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 [17 Cal.Rptr.3d 906, 96 P.3d 194].)

At the June 2005 hearing, the trial court stated, "[W]e know that a cardholder means the natural person [to] whom the credit card is issued for consumer credit purposes" but if the transaction involves "a natural person where the card is issued for business purposes, I think [plaintiffs] are out at the get-go." The court commented, "If the law goes one way, certification is going to be easy. If the law goes the other way, I think, we'll have an ascertainability problem."

On May 24, 2005, the trial court denied certification of a class for the SBCCA and CLRA claims. The court stated it "will not accept mailing to an over-inclusive group with the hope that somehow at a later date we can cull out the truly deserving. That means that in order to certify, we must decide how to identify the people who were entitled to section 1747.08 protections

when they engaged in a transaction with [defendants]." The court found "this determination will be intensively fact-driven." In reaching this conclusion, the court deferred to two federal district court cases involving the TILA in which those courts determined that separate inquiries and determinations would have to be made regarding whether the credit card was for personal, namely, consumer, or business use.[18] The court further found that to certify a class "would require at this juncture, and at plaintiffs' expense, a detailed review of all the credit card transactions."

We note that the trial court did not address whether a class could be ascertained under the SBCCA and CLRA claims if no inquiry and determination had to be undertaken regarding the purpose, either consumer or business, to which the personal credit card had been used on a transaction-by-transaction basis. We further note the court did not address in its order whether it would be unreasonably time consuming or expensive to distinguish between transactions in which a business card as contrasted with a personal card were used.[19]

In view of this procedural posture, we reverse the order denying certification of a class under the SBCCA and CLRA claims and remand for the trial court to conduct further proceedings to determine whether a class of personal credit card holders could be ascertained without regard to the purpose for which the personal credit card was used in a particular transaction.

[18] The trial court stated: "In *Zeltzer v. Carte Blanche Corporation*[, *supra,*] 76 F.R.D. 199, 203–[2]04, the court concluded that examinations of and individual determinations would have to be made regarding a business or consumer use of an airline charge plan. In *Berkman v. Sinclair Oil Corp.*[, *supra,*] 59 F.R.D. 602, 60[9], the court wrote: [¶] Furthermore, the substantial difficulty which would be encountered by the parties in proving various members of the class use their cards primarily for business rather than for personal use has already been demonstrated with regard to the named plaintiff, Adelman. The Act is primarily directed at consumer protection rather than business credit. Defendants contend that they have the 'due process' right to require proof as to whether the primary use of the credit card during the months in question was personal or business from each of its credit card holders. The necessity for such proof makes this action entirely unmanageable. A shorter route of proof might well deprive defendants of 'due process' rights which under Rule 23(b)(3) [of the Federal Rules of Civil Procedure (28 U.S.C.)] is strictly prohibited."

[19] In support of their class certification motion, plaintiffs submitted the declaration of their expert witness, Arthur E. Clark, Jr. At the June 2005 hearing, the trial court rejected defendants' evidentiary objections to Mr. Clark's declaration. In his declaration, Mr. Clark explained that with regard to MasterCard and Visa, it was possible to determine whether the card used to pay for the product or services was "a credit card or a signature debit card or whether the card was a business or personal card." American Express, Discover, and Diners Club, however, do not provide information necessary for the merchant to determine whether a particular card used was a consumer card or a business card. Such determination could be made with the assistance of American Express as to its credit cards. In response to the court's inquiry, plaintiffs' counsel advised the court that the card issuer could determine whether the card was a consumer card or a business card and would supply this information. The court indicated that on this basis it was inclined to certify the class.

## DISPOSITION

The order denying class certification for the Song-Beverly Credit Card Act of 1971 and Consumers Legal Remedies Act claims is reversed and the matter is remanded for further proceedings. In all other respects, the judgment is affirmed. Each party shall bear its own costs on appeal.

Rothschild, J., and Johnson, J., concurred.

A petition for a rehearing was denied June 13, 2011, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied August 31, 2011, S194378.