Filed 4/26/16  Santamarina v. Sears Roebuck & Co. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GUILLERMO GARCIA SANTAMARINA et al., | B246705 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC326946) |
| v. | |
| SEARS ROEBUCK & CO., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge.  Affirmed.

Motley Rice; Isaacs, Friedberg & Labaton, Mark I. Labaton; Barnow and Associates, Ben Barnow, Sharon Harris; Law Office of Aron Robinson, Aron Robinson; Tostrud Law Group, Jon A. Tostrud; Cuneo Gilbert & Laduca, Sandra W. Cuneo; Lowey Dannenberg Cohen & Hart, Barbara J. Hart, Jeanne D'Esposito and Sung-Min Lee for Plaintiffs and Appellants.

Greenberg Traurig, Karin L. Bohmholdt, Francis A. Citera and Jane B. McCullough for Defendant and Respondent.

Plaintiffs Guillermo Garcia Santamarina, Brenda Lifsey and Chris Wilson brought this putative class action against defendant Sears Roebuck & Co. (Sears), alleging Sears violated, inter alia, the Unfair Competition Law (UCL) and the False Advertising Law (FAL) by mislabeling, misrepresenting, and falsely advertising that its line of Craftsman tools and products was made in the United States, whereas in fact, many Craftsman products are made outside the United States or contain significant foreign-made components. Plaintiffs appeal the trial court's denial of their motion for class certification. For the reasons explained below, the trial court did not abuse its discretion in concluding that the class was overbroad and plaintiffs failed to establish ascertainability and/or commonality. We therefore affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Allegations of the complaint*

The operative pleading, plaintiffs' "Corrected Second Amended Complaint," (complaint), filed in January 2005, alleged the following.[1] Sears sells a propriety line of Craftsman tools and products, including power, garden, home and auto tools. The Craftsman brand consists of more than 5,000 products in 80 tool and equipment

---

[1] This matter was originally filed in Los Angeles County Superior Court. In 2005, Sears removed the action to the United States District Court for the Central District of California. It was then transferred to the United States District Court for the Northern District of Illinois and consolidated with several other cases against Sears in a multidistrict litigation proceeding. The matter was remanded in 2006 to Los Angeles County Superior Court on appellants' motion. (See *In re Sears, Roebuck & Co. Tools Marketing* (J.P.M.L. 2005) 381 F.Supp.2d 1383, 1384; *Greenfield v. Sears, Roebuck & Co.* (*In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*) (N.D.Ill., Mar. 22, 2012, MDL-1703, Nos. 05 C 4742, 05 C 4744) 2012 U.S.Dist. LEXIS 39561; *Chatham v. Sears, Roebuck & Co.* (*In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*) (N.D.Ill., Dec. 4, 2007, MDL-1703, Nos. 05 C 4742, 05 C 2623) 2007 U.S.Dist. LEXIS 89349; *Santamarina v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation)* (N.D.Ill., May 24, 2006, MDL-1703, Nos. 05 C 4742, 05 C 4743) 2006 U.S.Dist. LEXIS 36323, affd. by *Santamarina v. Sears, Roebuck & Co.* (7th Cir. 2006) 466 F.3d 570.) According to plaintiffs, the matter was then stayed pending our Supreme Court's decision in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 (*Tobacco II*).

categories, which are sold and distributed through various outlets, including Sears stores, Sears Auto Centers, Sears catalogs, the internet, and Orchard Supply Hardware (OSH) stores. Central to Sears's advertising is the claim that Craftsman tools and products are made in the United States. Sears's California advertising has made or implied this claim in television and print ads; in catalogs; on the Sears Craftsman website; on store signage; and through representations made by salespeople. The fact products are made in the United States is a material factor in many consumers' purchasing decisions.

This advertising is deceptive because "certain Craftsman tools and products contain parts that have been entirely or substantially made, manufactured, finished or produced outside of the United States" and "not all, or virtually all, of the Craftsman products" are made in the United States. Sears, at some point, decided to manufacture Craftsman products outside the United States as a means of saving money and increasing profit margins. In 2000, approximately 20 percent of Craftsman products were foreign-made; by 2005, the percentage had risen to 70 percent. Attached to the complaint were copies of print advertisements alleged to be false or misleading.

Sears also deceptively labeled Craftsman products as made in the United States. As examples of such mislabeling, the complaint described axes, hoes, mauls, sledge hammers, pitchforks, mattocks, rakes, tree pruning blades, and multi-bit screwdrivers that were incorrectly marked as "Made in U.S.A." Attached to the complaint were photographs of tools and products that were allegedly mislabeled.

Sears executives were aware that their customers believed Craftsman products were made in the United States. Sears had conducted and was aware of research showing consumers believed "Made in the U.S.A." was a significant attribute of Craftsman products. Sears was able to charge more for Craftsman products based on the claim they were American-made. Sears-commissioned studies determined that, if consumers learned Craftsman products were made overseas, some would not buy the products and others would pay less for them, necessitating a reduction in prices and a drop in profit margins. Sears "decided not to correct the misconception its customers had about the origin of its Craftsman products because such a disclosure would cost it money."

In response to litigation here and in other jurisdictions, Sears began obliterating "Made in the U.S.A." markings or labels on some Craftsman products and their packaging, and removed some of the allegedly false and misleading representations that had previously appeared on its website.

As to the named plaintiffs, the complaint alleged the following. Plaintiff Santamarina purchased several Craftsman tools, including a pruner, power drills, and a cap. Plaintiff Wilson purchased dozens of Craftsman products including tool sets, sanders, a rake and a cap. Plaintiff Lifsey purchased a lawn mower, power tools, and a wrench set. In each case, the advertising for the products and store signage stated "Made in U.S.A.," and the tools and/or packaging were labeled as "Made in U.S.A." or "Forged in U.S.A." When making the purchases, plaintiffs saw and relied on the labeling and/or advertising for the Craftsman line. Plaintiffs believed the products were made in the United States, and this belief was the primary factor in their decisions to purchase Craftsman, rather than a lower priced brand. Plaintiffs were unaware the products they purchased were not made in the United States. Lifsey additionally relied on the statements of a salesperson who told her all Craftsman products were made in the United States.

Based on the foregoing, the complaint alleged nine causes of action: unfair competition in violation of Business and Professions Code section 17200,[2] predicated on violation of: (1) section 17533.7 [making it unlawful to sell merchandise labeled "Made in U.S.A." when the merchandise or any part thereof was entirely or substantially made outside the United States], (2) title 15 United States Code sections 45 and 45a [regarding "Made in the U.S.A." labeling and unfair competition], (3) Civil Code section 1750 et seq., the Consumers Legal Remedies Act (CLRA), and (4) section 17500 [false or misleading statements]; (5) unfair business acts and practices in violation of section 17200; (6) commission of fraudulent business acts and practices in violation of

---

[2]     All further undesignated statutory references are to the Business and Professions Code.

4

section 17200; (7) unfair, deceptive, untrue, or misleading advertising in violation of section 17200; (8) untrue and misleading advertising in violation of section 17500; and (9) violation of the CLRA. Plaintiffs averred that the action could properly be maintained as a class action pursuant to Code of Civil Procedure section 382 and Civil Code sections 1752 and 1781 because they would fairly and adequately protect the interests of class members and the requisite numerosity, typicality, commonality of issues existed. Plaintiffs sought both injunctive relief and restitution.

The trial court sustained Sears's demurrer to the third and ninth causes of action for, or based on, violation of the CLRA, without leave to amend. It overruled Sears's demurrers as to the remaining causes of action.[3]

2. *The motion for class certification*

In January 2010, plaintiffs moved to certify the following class: "All persons who purchased, in the State of California from January 6, 2001 through the present, any Craftsman branded tool or product where any unit or part thereof was entirely or substantially made, manufactured, or produced outside of the United States."[4] Plaintiffs contended the class was ascertainable and sufficiently numerous, their claims were typical, common questions predominated over individual issues, they were adequate class representatives, and a class action was a superior means to adjudicate the claims. Plaintiffs' motion was not supported with evidentiary materials.

Sears opposed the motion, arguing plaintiffs had failed to satisfy their burden to establish any of the requisites for class certification. Sears contended the class was not ascertainable and was impermissibly overbroad; individual factual issues predominated on the questions of deceptive practices, materiality, reliance, injury, and monetary relief; the named plaintiffs were not adequate class representatives and their claims were subject to unique defenses; and class treatment was not a superior means of resolving the

---

[3]     These rulings are not challenged on appeal.

[4]     Excluded from the proposed class are Sears, related entities, and Sears's officers and directors and members of their immediate families.

litigation. Sears stressed that the proposed class included millions of consumers and thousands of products sold through a variety of channels; Sears had clearly identified many Craftsman products as imported or foreign-made for at least 35 years; not all Craftsman advertising included the phrase "Made in the U.S.A." or depicted the American flag; each putative class member would have been exposed to a unique mix of advertising through a variety of mediums; there was no national pricing structure; the "Made in the U.S.A." attribute never affected pricing of any foreign-made Craftsman product; and determining whether any particular consumer purchased a foreign-made Craftsman product would involve unreasonable time and expense and necessitate an individualized product-by-product, consumer-by-consumer, inquiry. In support of its opposition and its subsequent replies to plaintiffs' additional briefing, Sears offered, inter alia, declarations and excerpts from the depositions of Sears's personnel regarding Craftsman products, marketing, pricing, and advertising; pages from Sears catalogs and accompanying analysis of the frequency with which Craftsman products had been identified therein as foreign-made; a report prepared by expert witness Dr. Stephen Prowse;[5] and plaintiffs' discovery responses.[6]

In response, plaintiffs filed a reply and two supplemental briefs along with evidence in support of the motion. They argued that since 1992, Sears had carried on a ubiquitous, brand-wide advertising campaign aimed at convincing consumers that all Craftsman products were American-made; Sears charged a premium for Craftsman tools; damages could be calculated on a classwide basis based on the pricing differential between Craftsman tools and a lower-priced Sears tool line or competitors' tool lines; the class was ascertainable because the class definition was "objective and precise";

---

[5] The trial court did not consider a declaration and analyses by one of Sears's experts, Dr. Yoram Wind, apparently due to the pendency of its ruling on plaintiffs' objections to this evidence.

[6] This evidence, as well as the evidence presented by plaintiffs, is discussed in more detail where relevant, *post.*

purchasers could be identified by reference to Sears's databases; putative class members could "self-identify as having purchased Craftsman tools"; and if they did not know the origin of purchased products, "Sears [could] provide the answer." Plaintiffs' evidence in support of the motion included, among other things, market analyses and proposals prepared by or for Sears; Sears's strategic marketing materials and cost benefit analyses; pricing information; copies of print ads, scripts for television ads, and video of several advertisements, including those featuring racecar driver A.J. Foyt and television home improvement show host Bob Vila;[7] photographs of Sears signage; a 1998 floor plan for Sears's "Tool Land"; excerpts of the depositions of Sears's personnel regarding Craftsman production, marketing, and remediation efforts; plaintiffs' affidavits and discovery responses; employee sales tip guides; a 2006 printout of information extracted from a Sears database and deposition testimony regarding it; and emails between Sears personnel, vendors, or others.

---

[7]    For example, in one of the television advertisements, Foyt states, "People are selling tools today on the market, that I don't even think they know where they're made. And they're not a quality tool. One thing about the Craftsman tool, it's made here, and you know the quality's good. If something happens to it you can take it back, and you know where to take it back, because you know where it come from." Interspersed with Foyt's dialogue is text stating, "Made in America. Guaranteed forever." A voice-over states, "1800 Craftsman hand tools. Made in America. Guaranteed forever." The video files bear the dates 1999-2000, 2000-2001, and 2002-2003. In another advertisement, dated 2000-2001, Vila touts the functionality, portability, and pricing of a Craftsman tool set and case, and states at one point, "This is Craftsman, made in the U.S.A." One of the print advertisements pictures a ratchet with the headline, "Made in America. Because you need something to fix the things that aren't." Text in the ad states, "There's something about a tool that's made in America. It just feels better in your hand," and "That's why we insist that our over 1,800 hand tools are 'Made in America.' " Another included a photograph of wrenches and sockets arranged in a pattern representing the American flag, with the words "Life, liberty and the pursuit of more tools" and "1,800 Craftsman hand tools. Made in America. Guaranteed forever!"

3. *The trial court's ruling denying class certification and plaintiffs' appeal*

On November 30, 2012, the trial court denied plaintiffs' motion for class certification, explaining its reasoning in a lengthy written ruling. It concluded the numerosity requirement was met, as there were over 40 million Craftsman customers during the class period and over six million California transactions involving Craftsman products in 2004 alone. The court also found plaintiffs had shown representations that a product was made in the United States were material. (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 328-329 (*Kwikset).*) However, the other requisites for class certification were lacking.

First, the class definition was overbroad and the class was not ascertainable. The proposed class included persons who could not have suffered injury because they did not see any false or misleading advertising or labeling. Citing the federal district court's decision in the Sears multidistrict court litigation, the court explained the class would include persons who never saw the allegedly false or misleading representations. (See *Chatham v. Sears*, *Roebuck & Co.* (*In re Sears*, *Roebuck & Co. Tools Marketing and Sales Practices Litigation*), *supra*, 2007 U.S.Dist. Lexis 89349.) Based on the language of former section 17533.7 and plaintiffs' interpretation of the law, the proposed class included purchasers of Craftsman products where only an insignificant component, such as a single screw, was foreign-made.

Furthermore, putative class members would be unable to determine whether they were part of the class because of the difficulties in determining whether any particular tool was made outside the United States or contained foreign-made components. Class members whose tools were unmarked would be unable to make that determination. The court rejected the notion that once a class member identified himself or herself as a Craftsman purchaser, the burden should shift to Sears to identify the product's country of origin. The evidence showed Sears did not have a historical database listing the country of origin of its thousands of products over a ten-year-plus period, and determining this information would be "unacceptably time-consuming." There were also "serious problems" notifying class members, in that consumers "could have purchased Craftsman

8

tools from any number of sources, including OSH stores" and Sears had no central customer database.

For some of the same reasons, common questions did not predominate. The "most glaring problem involves the lack of uniformity in Defendant's advertising and the sheer number of products advertised." The evidence showed Craftsman advertising varied greatly and only a portion contained the "Made in the U.S.A." claim; salespeople were not uniformly trained to make such a representation. Unlike in *Tobacco II*, plaintiffs failed to present sufficient evidence of a uniform, long term advertising campaign falsely touting a "Made in the U.S.A." claim. Given the absence of uniform misrepresentations, plaintiffs were not entitled to a presumption of reliance, even though a "Made in the U.S.A." claim was material. The class representatives' claims were not typical; they were not exposed to the same advertising mix as each other, or as any other class member.

Further, there was no workable method to determine damages or restitution on a classwide, as opposed to individual, basis. The court rejected appellants' contention that product-by-product inspection to discern the measure of recovery was not required, finding several proposed methodologies for calculating injury on a classwide basis either untenable or unsupported by the evidence.

Finally, the court concluded the plaintiffs had not demonstrated that allowing the case to proceed as a class action would be superior. It explained: "The resources that would be needed to manage this case as a class action would be vast, given the number of products Sears makes and the need to determine which of those were made 'wholly or substantially' outside the United States. Class members would need to be grouped according to what they purchased, whether part or all of that product was made overseas, whether they saw any advertising (never mind what kind and where) and whether the ads were material to their decision to purchase. The cost and time of this process virtually eliminates any benefit to be achieved by class treatment. To manage this case and its more than 40 million putative class members would be a nightmare, made more daunting by the lack of an appropriate measure of damages."

9

Plaintiffs timely appealed the trial court's November 30, 2012 order. The appeal lies. (See *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435; *Richmond v. Dart Industries*, *Inc.* (1981) 29 Cal.3d 462, 470.)

DISCUSSION

1. *Standard of review*

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022; *Tobacco II*, *supra*, 46 Cal.4th at p. 311; *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089.) If the trial court applies proper criteria and its ruling is founded on a rational basis, its ruling will be upheld. (*Brinker Restaurant Corp.*, at p. 1022.) We presume in support of the ruling the existence of every fact the trial court could reasonably deduce from the record. (*Ibid.*) Where a ruling on class certification turns on inferences to be drawn from the facts, a reviewing court has no authority to substitute its decision for the trial court's. (*Davis-Miller v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 106, 120 (*Davis-Miller*).)

" 'Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. [Citation.] But on appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial. [Citation.] We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. [Citation.]' [Citation.] Any valid, pertinent reason will be sufficient to uphold the

10

trial court's order." (*Thompson v. Automobile Club of Southern California* (2013) 217 Cal.App.4th 719, 726 (*Thompson*); *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327; *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843–844 (*Kaldenbach*).)

2. *Class action standards*

Code of Civil Procedure section 382 authorizes the maintenance of a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (*Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905, 917 (*Sevidal*); *Kaldenbach*, *supra*, 178 Cal.App.4th at p. 843.) To obtain certification, the plaintiffs have the burden of showing the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. (*Tobacco II*, *supra*, 46 Cal.4th at p. 313; *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1021.) The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. (*Brinker Restaurant Corp.*, at p. 1021; *Sevidal*, at p. 917.) The " 'certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." ' [Citation.]" (*Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966, 974 (*Cohen*); *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 938.)

3. *The UCL, the False Advertising Law, and section 17533.7*

Section 17533.7 makes it unlawful for "any person, firm, corporation, or association to sell or offer for sale in this state any merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.,' 'Made in America,' 'U.S.A.,' or similar words if the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." (§ 17533.7, subd. (a).) In 2015, the statute was amended to add subdivision (b), effective January 1, 2016, which provides: "This section shall not apply to merchandise made,

11

manufactured, or produced in the United States that has one or more articles, units, or parts from outside of the United States, if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product." (§ 17533.7, subd. (b).)

The UCL (§ 17200 et seq.), prohibits and provides civil remedies for unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (§ 17200; *Kwikset*, *supra*, 51 Cal.4th at p. 320; *Kaldenbach*, *supra*, 178 Cal.App.4th at p. 847.) Its purpose is to protect consumers and competitors. (*Kwikset*, at p. 320.) The UCL's substantive provisions are framed in broad language to effectuate this purpose. (*Ibid.*) " 'By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the [UCL] makes independently actionable.' [Citation.]" (*In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 790.) Under the UCL, there are three varieties of unfair competition: practices that are unlawful, unfair, or fraudulent. (*Tobacco II*, *supra*, 46 Cal.4th at p. 311.) Here, Sears's allegedly false advertising falls in the third category; false labeling falls also within the first. (*In re Tobacco Cases II*, at p. 790 [false advertising falls within the "fraudulent" category of prohibited practices under the UCL].)

California's false advertising law (§ 17500 et seq.) "is equally comprehensive within the narrower field of false and misleading advertising." (*Kwikset*, *supra*, 51 Cal.4th at p. 320.) Section 17500 provides in pertinent part that it is unlawful for any corporation, with the intent to dispose of personal property, to knowingly make untrue or misleading statements in advertising. The statute proscribes not only false advertising, but also advertising which, although true, is either actually misleading or likely to deceive or confuse the public. (*Colgan v. Leatherman Tool Group*, *Inc.* (2006) 135 Cal.App.4th 663, 679.) A violation of the UCL's fraud prong is also a violation of the false advertising law. (*Tobacco II*, *supra*, 46 Cal.4th at p. 312, fn. 8; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 630, fn. 4 (*Pfizer*).) The remedies available in a UCL or FAL action are generally limited to injunctive relief and restitution.

12

(*Tobacco II*, at p. 312; *Pfizer*, at p. 631.) "[R]estitution under the statutes involved here must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." (*Colgan*, at p. 698.)

"Historically, in order to state a cause of action under either the UCL or the FAL, case law only required a showing that ' "members of the public [were] *likely to be deceived*." [Citations.]' [Citation.] Allegations of actual deception, reasonable reliance and damage were unnecessary. [Citation.]." (*Pfizer*, *supra*, 182 Cal.App.4th at p. 630.) "However, in November 2004, the voters approved Proposition 64, which provided that ' "a private person has standing to sue only if he or she 'has suffered injury in fact and has lost money or property as a result of such unfair competition.' " ' " (*Sevidal*, *supra*, 189 Cal.App.4th at pp. 923-924.) "In *Tobacco II*, the California Supreme Court held that this new standing requirement applied only to the class representatives, and not to absent class members." (*Id*. at p. 924.) Proposition 64 did not alter the "likely to be deceived" standard. (*Pfizer*, at p. 630.)

4. *Denial of class certification was not an abuse of discretion*

Plaintiffs argue that the superior court improperly applied the standards articulated in *Tobacco II*, erroneously relied on the federal district court's analysis, impermissibly weighed the lawsuit's merits, and made unsupported findings. Because at least some of the trial court's stated reasons justified its ruling, we discern no abuse of discretion.

a. *Because the proposed class definition does not require that putative class members saw false or misleading Craftsman advertising, the proposed class is overbroad and lacks commonality*

The trial court concluded the proposed class was overbroad, and common issues of fact did not predominate, because the class definition was not limited to persons who saw the allegedly false "Made in the U.S.A." claims. The court reasoned that the putative class "would include people who (1) bought Craftsman tools but never saw any Craftsman advertising; (2) bought Craftsman tools but never saw advertising representing that the tools were made in the United States; and (3) bought Craftsman tools with the

13

knowledge that those tools were not made in the United States." The court reasoned that none of these persons could prove deception, and the class was therefore overbroad and not ascertainable.

The trial court's reasoning on this point was correct. "[W]hen the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class. [Citations.]" (*Fairbanks v. Farmers New World Life Ins. Co.* (2011) 197 Cal.App.4th 544, 562; *Davis-Miller*, *supra*, 201 Cal.App.4th at p. 121; *Knapp v. AT&T Wireless Services, Inc.*, *supra*, 195 Cal.App.4th at pp. 944–945; *Kaldenbach*, *supra*, 178 Cal.App.4th at pp. 849- 850.) "[W]e do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice." (*Cohen*, *supra*, 178 Cal.App.4th at p. 980.)

In *Pfizer*, the named plaintiff filed a consumer action against the manufacturer of Listerine mouthwash, alleging that Pfizer marketed, promoted, and labeled Listerine in a misleading manner by indicating it was as effective as dental floss in reducing plaque and gingivitis. (*Pfizer*, *supra*, 182 Cal.App.4th at p. 625.) The complaint asserted, inter alia, UCL and FAL causes of action. (*Ibid.*) The trial court certified a class of " 'all persons who purchased Listerine, in California, from June 2004 through January 7, 2005.' " (*Ibid.*) After considering the impact of Proposition 64, the Supreme Court's *Tobacco II* decision, and the precept that relief under the UCL is available without individualized proof of deception, reliance, and injury, we concluded that the class was grossly overbroad because many, if not most, class members were never exposed to the alleged misrepresentations. (*Pfizer*, at p. 631.) Approximately half of the Listerine bottles sold during the class period did not include a label stating that Listerine mouthwash was comparable to floss. Pfizer ran four different television commercials with the " 'as effective as floss' " campaign, but they did not run continuously and there was no evidence a majority of Listerine consumers viewed them. (*Id.* at pp. 631-632.) "Thus, perhaps the majority of class members who purchased Listerine during the pertinent

14

six-month period did so not because of any exposure to Pfizer's allegedly deceptive conduct, but rather, because they were brand-loyal customers or for other reasons." (*Id.* at p. 632.)  We concluded:  "*Tobacco II* does not stand for the proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign is entitled to restitution."  (*Ibid*.)  "[O]ne who was not exposed to the alleged misrepresentations and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution."  (*Id.* at p. 631; cf. *Perrine v. Sega of America, Inc.* (N.D.Cal. May 12, 2015, No. 13-cv-01962-JD) 2015 U.S. Dist. Lexis 62326, at pp.*6-7 [although class members need not demonstrate individualized reliance under the UCL and FAL, no presumption of reliance applies unless everyone in the class was " 'exposed,' meaning that 'it is necessary for everyone in the class to have viewed the allegedly misleading advertising' "].) [8]

The same is true here.  Insofar as plaintiffs' claims are based on allegations of false advertising, the proposed UCL and FAL class is overbroad because it presumes there was a classwide injury, despite the fact it is not limited to Craftsman customers who were exposed to deceptive advertising or labeling.  (*Pfizer*, *supra*, 182 Cal.App.4th at p. 632; *Sevidal*, *supra*, 189 Cal.App.4th at p. 926 [class was overbroad where a majority of class members were never exposed to the alleged misrepresentation and there was no likelihood they were deceived by the alleged false advertising]; cf. *Brinker Restaurant Corp. v. Superior Court*, *supra*, 53 Cal.4th at p. 1050 [class definition in wage and hour action was overinclusive where "[t]he definition on its face embraces individuals who now have no claim against [defendant]"]; *In re Scotts EZ Seed Litigation* (S.D.N.Y. 2015) 304 F.R.D. 397, 404, 406 [typicality requirement satisfied where each container of product bore the allegedly misleading claim]; *McAdams v. Monier, Inc.* (2010) 182 Cal.App.4th 174, 192 [reversing order denying class certification but making

---

[8]     Unpublished federal opinions are citable as persuasive, but not precedential, authority notwithstanding California Rules of Court, rule 8.1115.  (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4.)

definition of the class subject to the proviso that class members must have been exposed to misrepresentation prior to purchasing product].) Not all Craftsman advertisements made the "Made in the U.S.A." claim. Not all Craftsman products were foreign-made. Some advertisements making the American-made claim pertained to tools that were, in fact, made in the United States. Only where a plaintiff saw a misrepresentation that a particular Craftsman product, or all Craftsman products, were U.S.A.-made, *and* then purchased a foreign-made Craftsman product, could he or she possibly have suffered injury. (See *Pfizer*, at p. 631.)

Appellants attempt to overcome this defect in several ways. They aver that the trial court misapplied *Tobacco II* when it considered whether consumers were deceived by Sears's advertising, in light of *Tobacco II's* reasoning that only the class representatives must prove reliance. We reject this argument in light of *Pfizer* and the other authorities discussed *ante.* Moreover, *Tobacco II* pertains only to the standing inquiry, which is not at issue here. As explained in *Cohen*, *supra*, 178 Cal.App.4th 966, in *Tobacco II*, "the Supreme Court specifically addressed two questions: 'First, who in a UCL class action must comply with Proposition 64's *standing* requirements, the class representatives or all unnamed class members, in order for the class action to proceed . . . Second, what is the causation requirement for purposes of establishing *standing* under the UCL . . . ?' [Citation.] . . . [T]he Supreme Court answered these two questions by ruling (1) only the class representatives must meet Proposition 64's *standing* requirements of actual injury and causation; (2) only the class representatives must establish reliance in accordance with fraudulent inducement principles in order for the class action to proceed; and (3) the class representatives do not have to show reliance on particular advertisements or marketing materials with 'unrealistic' specificity. [Citation.] [¶] Viewed from the other direction, *Tobacco II* held that, *for purposes of standing* in context of the class certification issue in a 'false advertising' case involving the UCL, the class members need not be assessed for the element of reliance. Or, in other words, class certification may not be defeated *on the ground of lack of standing* upon a showing that class members did not rely on false advertising. In short, *Tobacco II* essentially ruled

that, *for purposes of standing*, as long as a single plaintiff is able to establish that he or she relied on a defendant's false advertising, a multitude of class members will also *have standing*, regardless of whether any of those class members have in any way relied upon the defendant's allegedly improper conduct. [¶] In the contextual setting presented by [plaintiff's] present case, we find *Tobacco II* to be irrelevant because the issue of 'standing' simply is not the same thing as the issue of 'commonality.' . . . We see no language in *Tobacco II* that suggests to us that the Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification. On the contrary, the Supreme Court reiterated the requirements for maintenance of a class action, including (1) an ascertainable class and (2) a ' "community of interest" ' shared by the class members. [Citation.] In short, the trial court's concerns that the UCL and the CLRA claims alleged by [plaintiff] and the other class members would involve factual questions associated with their reliance on DIRECTV's alleged false representations was a proper criterion for the court's consideration when examining 'commonality' in the context of the subscribers' motion for class certification, even after *Tobacco II*." (*Cohen*, at pp. 980-981.) Other courts, including this one, have followed *Cohen*'s reasoning. (See *Davis-Miller*, *supra*, 201 Cal.App.4th at p. 124 ["Here, as in *Cohen*, *Tobacco II* is 'irrelevant because the issue of "standing" simply is not the same thing as the issue of "commonality" ' "]; *Knapp v. AT&T Wireless Services*, *Inc.*, *supra*, 195 Cal.App.4th at p. 945.)

Moreover, plaintiffs' argument ignores the fact that the class in *Tobacco II* was defined in part by whether smokers had seen defendants' false advertising: California residents who " 'smoked in California one or more cigarettes between June 10, 1993 to April 23, 2001, *and who were exposed to Defendants' marketing and advertising activities in California.*' " (*Tobacco II*, *supra*, 46 Cal.4th at pp. 306, 309, 324, italics added.) Plaintiffs' proposed class contains no such limitation.

Plaintiffs further argue that they established classwide exposure to Sears's false advertising by presenting evidence the "Made in the U.S.A." campaign was substantial and decades long. Sears spent large sums on advertising during the class period, and

17

Sears's internal marketing and strategic planning materials show Sears treated the "Made in the U.S.A." claim as a valuable brand asset and the cornerstone of its ability to differentiate the brand in the marketplace. Under such circumstances, they aver, "exposure language is unnecessary." They contend it is "hard to imagine any California consumer could have purchased a Craftsman product without exposure at some point to the gauntlet" of ads, labels, and other materials featuring a "Made in the U.S.A." message.

First, the trial court rejected the notion that the evidence showed a decades-long, ubiquitous advertising campaign comparable to that in *Tobacco II*. Substantial evidence supports this finding. The evidence presented showed "Made in the U.S.A." claims were made in Sears's television and print advertising from 2000 through 2004. Some of these advertisements, however, pertained only to particular products, and there is no showing those products were made outside the United States. The evidence does not demonstrate that the bulk of Sears's print and television advertisements made a generalized claim that all Craftsman products were made in the United States. Plaintiffs presented scripts or videos for approximately 11 television advertisements that either ran, or were prepared, in 2000 through 2002 and included "Made in the U.S.A." claims. At least three of those make an American-made claim only in regard to "hand tools." Evidence showed that only a few of approximately 65 different Craftsman television advertisements that ran between 2002 and 2004 included a "Made in the U.S.A." claim. Of approximately 45 print ads apparently available for Sears's use in 2002 through 2004, only seven made a "Made in the U.S.A." claim; four of those expressly referred to particular tools or hand tools, and there is no showing those tools were not made in America.

Tom Arvia, Sears's Divisional Merchandise Manager of Tools, Paint, and Hardware, declared that Craftsman advertising varied based upon the particular product being sold, the time period, the advertising media, and the selling channel. For the period 2001 through 2010, over 800 different advertisements (exclusive of packaging and labeling) were disseminated for different Craftsman products. Television and magazine ads comprised only a "small fraction" of Sears's advertising, and many Craftsman

18

advertisements during this period did not include a "Made in the U.S.A." claim. The portion of advertising including such claims was small compared to the portion that did not include "Made in the U.S.A." claims. The packaging, labeling, and die sunk stamping on "thousands of imported Craftsman products" indicated the products were not American-made. Glori Katz, Sears's former Director of Broadcast Advertising and Marketing, declared that Craftsman advertising appeared in a wide variety of mediums; nationally and within California, some advertising described certain Craftsman products as foreign-made; and only some Craftsman advertising described certain Craftsman products as being "Made in the U.S.A" or depicted an American flag. An email indicated Sears's website omitted the claim that Craftsman products were made in the United States in December 2004.

Given that the time period at issue was several years, and only some Sears advertising and marketing could potentially be found to be false or misleading, substantial evidence supported the trial court's finding that the advertising at issue here is not equivalent to the decades-long campaign in *Tobacco II*. In contrast to the evidence here, *Tobacco II* "involved identical misrepresentations and/or nondisclosures by the defendants made to the entire class." (*Kaldenbach*, *supra*, 178 Cal.App.4th at p. 849.) Although plaintiffs complain that the court ignored a "mountain" of evidence and instead relied on Arvia's declaration, this argument misconstrues the standard of review. We do not reweigh the evidence. (See *Sav-On Drug Stores*, *Inc. v. Superior Court*, *supra*, 34 Cal.4th at p. 338; *Sevidal*, *supra*, 189 Cal.App.4th at p. 918; *Kaldenbach*, at p. 844.)

The fact Sears viewed the "Made in the U.S.A." attribute as a valuable marketing tool, and attempted to capitalize on it in some of its advertising, simply does not give rise to the inference that all, or most, members of the proposed class saw such advertising. Plaintiffs also argue that marketing research materials commissioned by Sears repeatedly showed consumers associated "Made in the U.S.A." with Craftsman, a circumstance plaintiffs contend "empirically prove[s]" classwide exposure. We disagree. Even if marketing research could substitute for an actual requirement that class members were exposed to the allegedly false or misleading advertising, it does not suffice here. A Sears

19

internal "2003 Brand Strategic Plan" PowerPoint presentation indicated that 77 percent of consumers associated Craftsman with the "Made in the U.S.A." attribute. But the document included no information regarding the source of this conclusion. Another PowerPoint presentation entitled "Craftsman – Made in USA," stated that "[r]epeated quantitative and qualitative consumer research studies over the last 7 years" established a "clear, dominant association between the Craftsman brand and made in USA as a tool attribute." This document, however, appears to have been generated in 2000, outside the class period. Moreover, it states that "[c]urrently, 80% of Craftsman products [are] USA-made." Given that at the time, a majority of Craftsman products apparently *were* made in the United States, the inference that consumers' perceptions were based on exposure to false advertising is weak.

Plaintiffs give particular weight to a May 2006 report indicating that in a survey of a representative sample of 393 homeowners, 90 percent believed that Craftsman hand and power tools were made in the United States, and perceived Craftsman to be American-made more than other brands. A "Hardline Tracking Program" prepared by a marketing research firm for the first quarter of 2006 indicated that 79 percent of survey participants thought Craftsman hand tools had a reputation of being made in America. And a 2005 "Brand Essence Exploration," based on two-hour sessions with 12 focus groups comprised of eight participants each concluded, among a multitude of other things, that " 'American made' " was a positive brand equity. There is little evidence regarding the methodology for these materials, and, importantly, no showing that consumers' beliefs were based on Sears advertising.[9] Moreover, there is no survey

---

[9]    Other materials cited by plaintiffs are even less useful. A 1998 document regarding Sears "Tool Land" floor plans; a 2001 email; a 2006 "Brand Plan"; a July 2005 "Brand Review" and an undated PowerPoint document, both stating that Sears "owns 'lifetime warranty' & 'Made in America' "; and a document reporting the results of a "mini brand audit" in which Sears employees and its advertising agencies participated, simply confirm that Sears personnel viewed the "Made in the U.S.A." attribute as important to marketing of the brand. An October 2003 email between Sears employees and a December 2002 PowerPoint presentation pertained to advertising objectives or "copy points," not marketing survey results.

evidence for any date after 2006. The evidence did not compel a conclusion that every purchaser of a Craftsman product was exposed to the allegedly false or misleading "Made in the U.S.A." claim.[10]

*In re Pom Wonderful LLC Marketing and Sales Practices Litigation* (C.D.Cal., Sept. 28, 2012, No. ML 10-02199) 2012 U.S.Dist. Lexis 141150, is distinguishable; in that case there was survey evidence consumers purchased defendant's pomegranate beverages because of the health benefits, a different question than whether consumers believed Craftsman tools were American-made. To the extent *Pom Wonderful* holds marketing directives and consumer surveys can substitute for an actual classwide exposure requirement, we disagree, at least on the evidence presented here. (See *People v. Beltran* (2013) 56 Cal.4th 935, 953 [decisions of the lower federal courts are not binding on questions of state law].)

b. *Difficulty of determining whether Craftsman tools sold during the class period were foreign-made or contained foreign components*

The trial court further concluded the class was not ascertainable because class members whose tools were unmarked would not know whether their products fell within the class definition, i.e., were made wholly or in part outside the United States. The court rejected the notion that once a class member identified himself or herself as a Craftsman purchaser, the burden should then shift to Sears to identify whether the product purchased had been made in the United States, because Sears did not have a reasonable means of determining the country of origin of thousands of tools over the lengthy class period.

---

**10** The federal district court in the multidistrict litigation reasoned that plaintiffs there had alleged Sears's "Made in the U.S.A." claim was not always deceptive, but became so at some point after the year 2000 when Sears began outsourcing production of Craftsman products. (See *Greenfield v. Sears, Roebuck & Co.* (*In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*), *supra*, 2012 U.S.Dist. Lexis at *32, fn. 6.) The trial court here agreed with the district court's analysis. Plaintiffs argue that this was error because Sears admits some of its Craftsman products have been imported for the past 35 years. The trial court's error of fact was not significant to its ruling, and does not require reversal.

21

These findings were not an abuse of discretion, and are supported by substantial evidence.[11]

Plaintiffs had the burden to show the proposed class was ascertainable. (*Archer v. United Rentals*, *Inc.* (2011) 195 Cal.App.4th 807, 828.) " 'Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members. [Citations.]' " (*Evans v. Lasco Bathware*, *Inc.* (2009) 178 Cal.App.4th 1417, 1422; *Cruz v. Sun World Internat.*, *LLC* (2015) 243 Cal.App.4th 367, 375.) "The ascertainability requirement is satisfied if 'the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation . . . .' [Citation.]" (*Sevidal*, *supra*, 189 Cal.App.4th at p. 919; *Cruz v. Sun World Internat.*, *LLC*, at p. 375; *Archer v. United Rentals*, *Inc.*, at p. 828.) Class members are ascertainable where they may be readily identified by reference to official or business

---

**11**     Arguably, analysis of this issue is related to commonality rather than ascertainability. *Cohen* explained: " 'Although courts sometimes treat [ascertainability and commonality] as if they were one, they are better examined separately because they serve separate purposes.' " (*Cohen*, *supra*, 178 Cal.App.4th at p. 975.) Ascertainability is required to give notice to putative class members as to whom the judgment will be res judicata. Common questions of law and fact are required to assure the interest of the litigants and the court are furthered by permitting the suit to proceed as a class action. (*Ibid.*) Therefore issues of proof vis-a-vis liability, causation and damages should be considered as part of the commonality analysis, not ascertainability. (*Id.* at p. 978.) Under this approach, ascertainability is tested by simply determining if class members may be identified from the most inclusive facial class definition. (*Marler v. E.M. Johansing*, *LLC* (2011) 199 Cal.App.4th 1450, 1460 (*Marler*).) *Marler*, on the other hand, took "a more nuanced approach. We do not exclude an analysis of community of interest factors in testing ascertainability. We may consider whether the class 'definition is overbroad,' and if the plaintiffs have shown that 'class members who have claims can be identified from those who should not be included in the class.' " (*Ibid.*) Whichever label is attached, the trial court's reasoning and conclusions here were not an abuse of discretion.

records.  (*Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50, 58; *Thompson*, *supra*, 217 Cal.App.4th at p. 728; *Sevidal*, at p. 919; *Archer v. United Rentals*, *Inc.*, at p. 828.)

The evidence supported the trial court's ruling.  Tom Arvia and Greg Inwood, Sears's former Vice President and General Merchandise Manager of Tools, Paint, and Hardware, declared that the Craftsman line includes over 900 different product classes and over 10,000 discrete products.  More than 40 million California customers purchased Craftsman items in California during the relevant period.  In 2004 alone, more than 7.5 million Craftsman products were sold in California.  Sears does not manufacture Craftsman products; instead it contracts annually with over 100 vendors to procure the Craftsman line.  Those vendors and products change each year.  Sears relies upon its vendors to accurately label the country of origin of Craftsman products.  A substantial portion of Craftsman items are U.S.A.-made, while others are not.  For example, marketing materials and item counts variously showed that of 5,120 hand tools, power tools, storage, and other items, 4,157 were made in the United States.  Another document indicates that 4,021 of 4,834 items, including patio, electric, security, storage, vacuums, compressors, tractors, mowers, hand tools, blowers, and other items, were American-made.  An excerpt from Sears's "CORE" database lists the origin of Craftsman products, with some being made in the United States and some elsewhere.  The percentage of products made in the United States changed over time.  Because of sourcing changes and inventory turnover, the same Craftsman product could be on store shelves in both "Made in the U.S.A." and foreign-made versions simultaneously.

Arvia and Inwood both confirmed that Sears does not maintain a database of historical data containing country of origin information by product for each year, nor does it maintain purchase information for all consumers of Craftsman products.  Sears does maintain a "complex database system" known or formerly known as CORE, which contained hundreds of data fields for any particular product, including country of origin information for all Craftsman products as well as all other Sears products.  However, the database "change[d] daily" as it was updated with new information.  A Sears Systems Manager declared that the raw data for a product listed in CORE cannot be extracted and

23

produced in the form in which it is maintained in CORE, but must be converted into a readable format using another program. This process can be time consuming, burdensome, and expensive. Sears was therefore unable to determine the manufacture date of all Craftsman products purchased in a particular year.

The evidence also showed that in order to determine the country of origin for a particular product, Sears would need to conduct a tool-by-tool analysis, starting with examination of the product's "stock keeping unit" (SKU). Some SKU's are die sunk, but can fade over time; other SKUs are on labels affixed to products. In the absence of a SKU, Sears would be unable to determine the country of origin without extensive research and inspection of the product. Even if Sears could identify the product via its SKU or inspection, it could not determine whether the item or a part of the item was foreign-made; only the vendor for that particular product at that particular point in time could verify that information. Vendor stipulations would have been stored in a file, but Inwood believed that they would not have been retained indefinitely.

Based on the foregoing, the trial court found country of origin information for particular tools could not be retrieved without unreasonable time and expense: "It appears that [Sears] truly 'does not maintain a database of historical information that contains country of origin information by product for each year' " and "Sears could verify country of origin by examining each tool and contacting the tool's manufacturer to obtain country of origin information [citation], but, in light of millions of customers with millions of tools, this process would be unacceptably time-consuming." The fact Sears was able to identify foreign-made products during its remediation efforts was insufficient to create an inference that Sears "now possesses information to cover the [entire] class period." The court rejected the notion that vendor stipulations would still be accessible based on Inwood's deposition testimony that he doubted the documents were still available.

We discern no abuse of discretion in the trial court's ruling. Ascertainability requires that class members be readily identifiable without unreasonable time and expense. (See *Sevidal*, *supra*, 189 Cal.App.4th at pp. 919, 921; *Hale v. Sharp Healthcare*, *supra*, 232 Cal.App.4th at pp. 58-59.) Purchasers of Craftsman tools that were made outside the United States, or that contain components made outside the United States, over a ten-year-plus period, are not a readily identifiable group. The evidence suggests many Craftsman purchasers would be unable to determine whether their product was made in or outside the United States, or contained a component made, manufactured, or produced outside the United States if that product was either mislabeled, unlabeled, or the foreign-made internal component was hidden from sight. If the country of origin information had been placed on the product's packaging, the putative class member would generally have no way of readily determining whether he or she fell within the class. It seems unlikely at best that most consumers will have retained packaging materials, especially for smaller items like hand tools, for years after purchase. If, as plaintiffs allege, some tools were mislabeled as "Made in the U.S.A.," even a "Made in America" label or stamp would not necessarily answer the question for a putative class member. If the problem with a particular product is that various steps in the manufacturing process were completed outside the United States, identification might be even more difficult.[12] (See generally *Colgan v. Leatherman Tool Group*, *Inc.*, *supra*,

---

[12] Plaintiffs take issue with the trial court's statement that the "meaning of 'substantially' " in section 17533.7 was "problematic, despite the fact that is it taken from" the statutory language. The court opined that if a single foreign-made screw in a lawn mower rendered the mower foreign-made, then for practical purposes, "Plaintiffs . . . ask to certify a class of all persons who purchased a product with any component made outside the US." Plaintiffs contend the court's holding "usurped the power of the [L]egislature," effectively "repealed [section 17533.7]," and is therefore reversible error. Plaintiffs overstate the significance of the court's statement. The trial court did not state that the law was unenforceable, nor did it hold that a class could never be certified due to a strict "single screw" standard. It appears it was concerned about the manageability of the class, or felt ascertainability was lacking if class membership depended on the genesis of miniscule components of Craftsman products, the origin of which might not be obvious. In any event, as noted, the Legislature has amended

135 Cal.App.4th at pp. 673, 681-682 [Made in the U.S.A. representations were deceptive where parts of the tools were investment cast, fineblanked, formed, hardened, cut, forged, polished or machined in foreign countries].) Even where it can be confirmed that a particular product was foreign-made during a particular time period, this would not entirely solve the problem: at least for small purchases made early in the class period, it is unlikely most purchasers would recall, or have records indicating, the year in which the item was purchased.

Certainly, some consumers could self-identify. Class representative Wilson, for example, allegedly purchased a rake with a metal head stating it was made in Austria, but the label on the wooden handle reads USA. The same would be true if a consumer's product clearly states it was made outside the United States, and the consumer saw advertising stating the opposite. However, the fact some consumers can be identified does not mean the class as a whole is ascertainable. (*Sevidal*, *supra*, 189 Cal.App.4th at p. 921.) The proposed class involved thousands of products, only some of which were foreign-made during the entire class period. As the court stated at the hearing, the determination of whether a consumer was a class member would be "tool by tool, year by year all the way down the line." On this record, we cannot say the trial court abused its discretion. Given that there are thousands of Craftsman tools, millions of purchasers, a time period of over ten years, and no ready means of determining whether each hammer, lawn mower, or screwdriver was American-made, determining whether many Craftsman purchasers fell within the proposed class would necessitate a time consuming, individualized inquiry.

---

section 17533.7 to provide that it does not apply to merchandise made, manufactured, or produced in the United States "if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product." (§ 17533.7, subd. (b).)

Plaintiffs argue that the trial court's finding was erroneous because it ignored the fact that Sears managed to produce a printout of some CORE database information, which plaintiffs aver covered the years 2001 through 2005.  But assuming the cited evidence supports a conclusion the CORE database information was more readily available than Sears admits, this does not warrant reversal.  "[T]he proper standard of review is not whether substantial evidence might have supported an order granting the motion for class certification, but whether substantial evidence supported the trial court's conclusion . . . ."  (*Knapp v. AT&T Wireless Services*, *Inc.*, *supra*, 195 Cal.App.4th at pp. 940-941; *Sevidal*, *supra*, 189 Cal.App.4th at p. 918 [we do not reweigh the evidence and must draw all reasonable inferences supporting the court's order]; *Kaldenbach*, *supra*, 178 Cal.App.4th at p. 844 ["we are concerned with whether substantial evidence supports the court's reasoning, not with whether there was evidence that might have supported a different conclusion"].)

Plaintiffs also argue that any inability to determine the country of origin is attributable to Sears.  They aver that federal law and regulations required Sears to maintain import records for five years (19 C.F.R. §§ 163.2, 163.4 (2012); 19 U.S.C. § 1508(a)), and label imported products (19 C.F.R. § 134.11 (2012)).[13]  But title 19 Code of Federal Regulations part 134.11 provides that every article of foreign origin *or its container* shall be marked as "permanently as the nature of the article (or container) will permit."  It is fanciful to think most purchasers of Craftsman products retained the container or packaging of small items for years after purchase; therefore Sears's

---

**13**　　Title 19 Code of Federal Regulations part 134.11 (2012), provides:  "Unless excepted by law, section 304, Tariff Act of 1930, as amended (19 U.S.C. 1304), requires that every article of foreign origin (or its container) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit, in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article, at the time of importation into the Customs territory of the United States.  Containers of articles excepted from marking shall be marked with the name of the country of origin of the article unless the container is also excepted from marking."

compliance with the regulation would not necessarily assist consumers in identifying the country of origin. As to record keeping, Sharon Bringelson, Sears's Divisional Vice President of Transportation and International Operations, declared she is familiar with Sears's "record-keeping obligations" under federal law. She explained that Sears maintains customs records only for products that Sears imports and for which Sears serves as the importer of record; Sears was not the importer of record for all imported Craftsman products sold between 2000 and 2011; and therefore "Sears does not and never has possessed customs records for all Craftsman products imported into the United States during this time period." Plaintiffs' bare citation to federal law governing record keeping obligations, without any explanation of whether or how they apply to Sears, is insufficient to preserve this argument.[14] (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; *Tilbury Constructors*, *Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482.)

Next, plaintiffs argue that Sears persuaded the trial court the class was not ascertainable "in part by defying its discovery obligations." They point to a portion of the trial court's class certification ruling in which it discounted plaintiffs' evidence of store signage because there was no showing the tools displayed beneath were foreign-made. Plaintiffs aver that the trial court "did not have that particular information because Sears refused to comply with the court's explicit discovery orders." They also complain that Sears has "been under litigation hold obligations to maintain all relevant documents and information," and should therefore have ceased overwriting the CORE database. Plaintiffs moved for discovery sanctions in regard to their seventh set of interrogatories while the class certification motion was pending;[15] the trial court ruled on the sanctions

---

**14** We express no opinion on the application of these statutes and regulations to Sears.

**15** Plaintiffs' seventh set of interrogatories contained two interrogatories: the first asked Sears to state what percentage of all Craftsman products were made in the United States for each year from 1999 through 2011, and the second asked the same question in regard to Craftsman hand tools.

28

motion after it ruled on class certification. Plaintiffs argue that the "trial court agreed with Plaintiffs that Sears failed to comply with its discovery obligations" when it ruled on the sanctions motion. Therefore, they argue that the court's finding that Sears "truly 'does not maintain a database of historical information' " should not bar a finding of ascertainability. Instead, Sears should be subject to a "negative inference that any Craftsman product whose country of origin records were not maintained be deemed" not to have been made in the United States. (See *Reeves v. MV Transportation*, *Inc.* (2010) 186 Cal.App.4th 666, 681-682 [" 'Spoliation' is ' "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation" ' " and the destruction of evidence relevant to proof of an issue at trial " 'can support an inference that the evidence would have been unfavorable to the party responsible for its destruction' "].)

These contentions lack merit. First, after plaintiffs moved to compel further responses on plaintiffs' fifth set of interrogatories, Sears agreed to supplement its responses regarding its remediation efforts. On September 23, 2011, Sears notified plaintiffs in a letter that it had no additional information to disclose. The sanctions motion pertained not to the fifth set of interrogatories, but to plaintiffs' seventh set of interrogatories, which did not involve Sears's signage or information regarding tool display. Therefore, there is no showing the trial court found Sears's September 23, 2011 letter was somehow a breach of its discovery obligations.

Second, in its ruling denying class certification, the trial court expressly found there was no evidence of spoliation and the negative inference suggested by plaintiffs was unwarranted. Plaintiffs provide no evidence proving otherwise. The trial court ultimately *denied* the sanctions motion. It ordered Sears to obtain more information from its vendors – a process it acknowledged would be "massively time consuming" -- but did not make a finding that the CORE database should have been frozen, or that Sears had committed any discovery violation or wrongdoing in continuing to allow daily

29

updating.[16]  Indeed, there is no evidence that the CORE database could have been programmed not to overwrite data while still remaining functional.  The declaration of Sears Systems Manager Arthur McKeague explained that "CORE is a complex database system at Sears which contains, among other things, summary level data on products, vendors, and logistical information for distribution and supply purposes.  Hundreds of fields of data may exist within CORE for any particular product . . . includ[ing] information regarding carton sizes for shipping product, carton weight, billing type, and other information.  CORE runs on a daily basis; thus CORE data as it appears on a given date for a particular product does not necessarily reflect information relating to that product over time."  Even if an order requiring Sears to cease use of what appears to be an important system in its daily operations would have been proper – a proposition that seems doubtful – no such order was issued here.

---

**16**     The court's written ruling was as follows:  "Plaintiffs request issue or evidentiary sanctions to the effect that Defendant's 'Made in USA' claims are false and misleading.  Defendant responds that its only obligation was to give 'its best shot' in a further response, which it alleges it has done.  As noted in earlier hearings, Sears apparently has the ability to obtain more information from its vendors, although the process will be massively time consuming.  Still, the information goes to the heart of the case and plaintiff deserves to have it, if it is possible to obtain.  While the court has ordered that Sears take steps to calculate the percentage of tools made in this country during any given year, including obtaining vendor certifications for every Craftsman product for every year of the class period, the court is not prepared to conclude that Sears' failure to complete this effort by now warrants evidence or issue sanctions."

Third, plaintiffs' argument is something of a red herring. At a September 2, 2011 hearing, the trial court queried whether plaintiffs were ready to proceed with the certification motion in light of the fact discovery issues were still outstanding. Class counsel replied: "Yes, your honor. We're ready to have the motion heard" and plaintiffs "would stand on the record as it exists and schedule arguments." Later, when hearing argument on the class certification motion, the trial court took note of the fact that the sanctions motion was still pending, and expressed concern about putting the "cart before the horse." Class counsel did not object or request that the certification motion be deferred.

      c. *Trial court's failure to sua sponte modify the proposed class definition*

Citing *Marler*, *supra*, 199 Cal.App.4th 1450, plaintiffs argue that the trial court "ignored its obligation to consider certification of a redefined and/or narrower class, including a class for injunctive relief." (See *Marler*, at p. 1462 [if necessary to preserve the case as a class action, " ' "the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable" ' "; because " 'it is the court's duty to certify an identifiable and ascertainable class, the court is not limited . . . to the class description contained in plaintiff's complaint' "]; see also *Safaie v. Jacuzzi Whirlpool Bath*, *Inc.* (2011) 192 Cal.App.4th 1160, 1174 ["trial courts have broad discretion to determine the propriety of class actions, including being procedurally innovative in certifying an appropriate class"].)

In *Marler*, however, the appellate court held the trial court should have allowed plaintiffs leave to amend their class descriptions to more concisely identify class and subclass members. (*Marler*, *supra*, 199 Cal.App.4th at pp. 1455, 1459.) The trial court here did not preclude plaintiffs from amending or narrowing the class description. Plaintiffs stated in their response to Sears's sur-reply that if the trial court concluded the class definition was overbroad, "the appropriate remedy is to allow Plaintiffs to amend the definition." The trial court heard oral argument on the class certification motion on September 14, 2012. At that hearing, it indicated that a class based on, for example, purchasers of an individual tool might be ascertainable. It orally issued its ruling on

31

November 6, 2012, and stated, "The plaintiffs are free to try again, but they have got to take a smaller bite." Plaintiffs' counsel indicated plaintiffs would "re-urge class cert for a narrower class." The trial court did not issue its written ruling for approximately three weeks thereafter. At no time did plaintiffs move to amend the class definition. It was plaintiffs' burden to define an ascertainable class. (*Sevidal*, *supra*, 189 Cal.App.4th at p. 918.) Under these circumstances, the trial court can hardly be faulted for failing to sua sponte redefine the class. (See *Chatham v. Sears, Roebuck & Co.* (*In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*), *supra*, 2007 U.S.Dist. Lexis 89349, at pp.*16-17 ["it is not the court's role to fashion plaintiffs' class definitions for them where the original proposed class is so problematic"; "[e]ssentially, plaintiffs' counsel has attempted to shift the task of class definition to the court"].)

Plaintiffs also argue that the trial court could have designated a subclass of persons who purchased Craftsman products that were falsely labeled as made in the United States even absent a requirement in the class definition that such persons saw false advertising. Their first cause of action for violation of the UCL is premised on Sears's alleged mislabeling of products, and thus is not dependent upon class members' exposure to false advertising. (See *Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145, 159 [class members' reliance is irrelevant to commonality where the UCL claim is based upon the "unlawful prong" of the UCL and thus presents no issue regarding reliance].) Plaintiffs aver Sears has identified 53 products that were foreign-made and mislabeled as American-made, and the trial court could have certified a subclass of purchasers of these products. But, again, plaintiffs did not ask the trial court to certify a class of purchasers of only those products, or of only plaintiffs who purchased mislabeled goods, and therefore its ruling cannot be faulted on this ground. Further, the trial court's concerns about ascertainability and commonality still exist in regard to such a subclass; as we have explained, identification of which of the thousands of Craftsman products were foreign-made during particular years cannot be accomplished, on the facts of this case, without unreasonable time and expense. The identification of 53 of 10,000 products is not an impressive indicator that identification is readily possible. We do not hold that

certification of a subclass or narrower class could never be possible. But the trial court did not abuse its discretion when it found the class as proposed is overbroad, not readily ascertainable, and commonality is lacking given the particular facts of this case and the evidence before the trial court.[17]

---

[17] Because the trial court properly denied the motion for the reasons addressed herein, we need not consider the other bases for the trial court's ruling and the parties' arguments related thereto. (See *Cohen*, *supra*, 178 Cal.App.4th at p. 981.)

We decline plaintiffs' request to take judicial notice of various tobacco advertisements available online, because even if these materials may be judicially noticed, consideration of them is unnecessary to our resolution of this matter.

## DISPOSITION

The trial court's order is affirmed.  Respondent is to recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, Acting P. J.


We concur:


LAVIN, J.


JONES, J.*

_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.